UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMELIA SMITH,

                  Plaintiff,

    -vs-

PATRICK R. DONAHOE, Post Master General
UNITED STATES POSTAL SERVICE,

                  Defendant.

**DECISION AND ORDER**
**No. 11-CV-6243T**

_____

## INTRODUCTION

Plaintiff Amelia Smith ("Smith" or "Plaintiff"), represented by counsel, brings this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), (codified at 42 U.S.C. § 2000(e), et seq.) and the Age Discrimination in Employment Act of 1967, ("ADEA")(codified at 29 U.S.C. § 621 et. seq.) alleging race, national origin and age discrimination, and retaliation against her by her former employer, the United States Postal Service ("Postal Service").

Defendant now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of Plaintiff's complaint in its entirety.  Plaintiff opposes the motion.  For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

The following facts are taken from the entire record, including the parties' submissions pursuant to Local Rule 56(a), and are not in dispute unless otherwise noted.  Dkt. Nos. 15, 16, 18.  Plaintiff, an African American female, was born on April 28, 1930 in Trinidad, and was 76-77 years old at all relevant times alleged in the Complaint.

Plaintiff worked for the Postal Service as a registered nurse beginning in September 1979 until her retirement in early 2008.  While employed, Plaintiff was assigned to the Western New York District Health Unit at the Postal Process and Distribution Center on Jefferson Road in Henrietta, New York.[1]  At all times relevant to the Complaint, Plaintiff was the only nurse on the Tour III shift, working from 4PM to 12:30AM.

Plaintiff's supervisor, Occupational Health Nurse Administrator (OHNA) Valerie Imburgia ("Imburgia"), supervised two medical units, one in Rochester and one in Buffalo.  Imburgia, who is white and was age 55 on the date of her deposition in June 2012, was stationed primarily in Buffalo and worked days from 8AM to 4PM.

OHNA Nurses Diane Galeazzo ("Galeazzo") and Lorie Wildman-Mackey ("Wildman-Mackey") worked in the Rochester Medical Unit on

---

[1]

Defendant notes that the Rochester Medical Unit was closed by the Postal Service in 2009, and that many of the employees referred to in this litigation no longer work for the postal service.  Dkt. No. 15-2 , ¶ 2, n.2.

Tour II.  Galeazzo, who at all relevant times was a white female in her fifties, worked days from 7AM to 3:30PM.  Wildman-Mackey, who at all relevant times was a white female in her forties, worked days from 8:30AM to 5PM.  According to Imburgia, two nurses were assigned to Tour II because of the heavier workload during the day tour.  According to the Defendant, the role of the Tour III nurse was to be available to employees on the evening tour in the event a medical need arose.  Plaintiff's job duties included, but were not limited to, treating minor injuries, conducting drug tests, blood pressure checks, and filing medical information.

In June 2006, Dr. Elaine Tunaitis, a contract physician assigned to the Rochester Medical Unit, directed Plaintiff to clean the lunch room in the Medical Unit while another nurse completed an employee's medical examination.

Plaintiff complains that, throughout 2007, while employed at the Postal Service, she was treated differently than her co-workers.  For example, Plaintiff maintains that Wildman-Mackey and Galeazzo would leave their work shift without completing duties such as organizing supplies and completing and filing charts, which Plaintiff had to complete.  Wildman-Mackey and Galeazzo would also occasionally leave without cleaning refuse and specimens from the Medical Unit which Plaintiff was then required to complete during her shift.  On occasion, Plaintiff was required to go to the workroom floor to retrieve supplies.  According to Imburgia, who

was responsible for managing the workload in the Rochester Medical Unit, the bulk of the direct patient work was done by the Tour II day nurses, occasionally leaving ministerial work for the evening staff to complete.  Plaintiff complained to Imburgia that she objected to the work left by the Tour II nurses, but never reported to Imburgia that she was being left less preferable work assignments based on her age or national origin or race.

Plaintiff also complains that, in 2007, while employed at the Postal Service, she was subjected to offensive language from her co-workers.  For example, Plaintiff overheard Galeazzo refer to an African American mail handler as an "ugly black pimp."  On another occasion, Galeazzo, in reference to an African American supervisor, allegedly stated that she "[couldn't] stand that woman."  On yet another occasion, Wildman-Mackey and Galeazzo allegedly remarked that Plaintiff was the "oldest one in here."  In 2007, Wildman-Mackey allegedly said to Plaintiff that she had been working too long and asked Plaintiff when she was going to retire.

On or about August 22, 2007, Wildman-Mackey sent an email to another Postal Service employee in which she disclosed Plaintiff's date of birth.  The following day, the Manager of Health and Resource Management reprimanded Wildman-Mackey about Wildman-Mackey's email disclosure.

In 2007, new procedures regarding medical charting were introduced to the Medical Unit. Imburgia, who reviewed these

procedures with the nurses, organized nurse staff meetings when shifts overlapped and made it a point to schedule the meetings when all nurses could be present.  Plaintiff disputes this and maintains that she was left out of these meetings, and would make charting errors in medical records because she did not receive the proper training.  Once the errors came to light, Imburgia would then discuss the new procedures with Plaintiff.  Plaintiff believed that Galeazzo and Wildman-Mackey told Imburgia about her errors. Imburgia counseled Plaintiff about charting procedures on three to six occasions in 2007 for 20-25 minutes on each occasion. Thereafter, Plaintiff began reporting to Imburgia errors that she uncovered that had been made by Wildman-Mackey and Galeazzo. Plaintiff was never given a letter of warning, demoted, or received any pay reduction as a result.

According to Imburgia, months after beginning her employment with the Postal Service in October 2006, she became aware of inadequate performance issues regarding Plaintiff's work, including whether proper paperwork was being completed, whether Plaintiff understood how to perform a breathalyzer test, instances where medical file documentation was incorrectly filed, and when work restrictions were not properly documented or that the supervisor was not made aware of necessary medical accomodations. Plaintiff admits that she sometimes made errors in paperwork and at times misfiled documents, but disputes that she did not know how to

perform a breathalyzer test, or that she regularly failed to properly document work restrictions.  According to Imburgia, issues also arose regarding Plaintiff's nursing judgment when, on one occasion, Plaintiff allowed an employee who sustained a head injury to drive himself home, which Plaintiff strongly disputes.  Imburgia was responsible for ensuring all occupational health nurses followed proper procedures and supervised all of the nurses responsible to her for compliance of performance standards. Imburgia met with Plaintiff on February 9, 2007, March 1, 2007, April 2, 2007, and June 26, 2007 to give her feedback and counsel her with respect to the performance issues.  This procedure followed a general policy in place requiring that errors should be reported to Imburgia.  When she uncovered errors made by Galeazzo or Wildman-Mackey, she similarly met with them and counseled them.

Based on the Plaintiff's work performance issues presented, Imburgia considered whether a Fitness-for-Duty examination was warranted.  Imburgia was also aware that Plaintiff had undergone four eye surgeries in 2007.  On March 29, 2007, Imburgia spoke with Idell Mitchell ("Mitchell"), head of Plaintiff's Union, about Plaintiff's performance issues.  According to Imburgia, Mitchell recommended that Plaintiff undergo a Fitness-for-Duty Examination. Imburgia reviewed the Fitness-for-Duty procedures, and spoke with her supervisor who approved Imburgia's preparation of a Request for Fitness-for-Duty Examination Form 2492.  Although Plaintiff agreed

to Imburgia's request that she undergo a Fitness-for-Duty examination, she never complied with that request.

On June 22, 2007, Plaintiff underwent two of her four eye surgeries.  When a Postal Service employee is on medical leave for an extended period, the Postal Service requires documentation from the employee's treating physician before the employee can return to work to ensure the employee is fit to work.  The Postal Service would typically require an employer's medical provider to provide a return-to-work date and any restrictions or limitations for the employee.  After her second eye surgery, an issue arose involving Plaintiff's return to work date, and Wildman-Mackey called Dr. Chawla, Plaintiff's eye doctor, for additional information concerning a diagnosis verification.  According to Plaintiff, Wildman-Mackey contacted Dr. Chawla for additional work information as a means to harass her based on her race.

On August 2, 2007, Imburgia was instructed by her supervisor to permit Plaintiff to return to work without an examination by a Postal Service physician, which Imburgia had wanted Plaintiff to undergo.  On that date, Imburgia called Plaintiff at home to inform her that she was released to return to work, and was given the option to return that day for her 4PM shift, or she could return the next day.  Imburgia incorrectly advised Plaintiff that if she returned on August 3, she would be paid administrative leave for August 2.  Upon learning of this error, the director of Postal

Service Human Resources in Buffalo, who had authority to determine
how Plaintiff was paid for the time out of work, instructed
Imburgia to contact Plaintiff to tell her that if she did not
return to work on August 2, she would be charged leave time.
Regardless of the director's instruction, the Postal Service
ultimately credited Plaintiff with administrative leave between
July 30 and August 2 for the time she was absent from work due to
any return to work issues.

On July 2, 2007, Plaintiff executed a PS Form 2564-A,
Information for Pre-Complaint Counseling.  On August 16, 2007,
Plaintiff filed an EEOC Complaint of Discrimination against the
Postal Service alleging that: (1) she was subjected to
discrimination and disparate treatment when her supervisor
subjected her to scrutiny and counseling because of performance
errors more than her white co-workers; (2) she was subjected to
disparate treatment because she was not allowed to return to work
on July 30, 2007 after surgery until cleared by a Postal Service
physician; (3) she was subjected to discrimination and disparate
treatment when she was told on August 2 that she could return to
work on August 3 and be compensated with administrative leave, and
then told she would not be paid for August 2; (4) she was subjected
to a hostile work environment based on her race due to the negative
attitude of her co-worker Galeazzo toward African Americans;
(5) she was subjected to a hostile work environment when her co-

workers reported her errors to their supervisor; and (6) that the type of discrimination she experienced was based on her race, color, and age.

On October 10, 2007, Plaintiff executed an Application for Immediate Retirement.

This civil action followed.

## DISCUSSION

### I.   Defendant's Motion for Summary Judgment

Pursuant to Rule 56, a court shall grant a motion for summary judgment if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(a).  A plaintiff can defeat a motion for summary judgment by "com[ing] forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case.  See Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986).  The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp., 477 U.S. at 322.  However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts."  See Scott v. Harris, 550 U.S. 372 (2007).

## II.  Two of Plaintiff's Claims are Unexhausted

It is well settled that prior to bringing an employment discrimination claim in federal court, a plaintiff must first exhaust his or her administrative remedies by filing an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"), or with a state agency authorized to investigate the allegations. 42 U.S.C. § 2000e-5(c)(Title VII claims); 29 U.S.C. §§ 626(d), 633(b); Johnson v. Palma, 931 F.2d 203 (2nd Cir. 1991).  In this case, Plaintiff complied with this requirement by filing an administrative complaint with the EEOC on August 16, 2007.

Plaintiff's administrative complaint, however, only alleged discrimination on the basis of her race and age.  Dkt. No. 16 at Ex. 27.  Plaintiff's EEOC complaint contains no allegations of discrimination based on her national origin, that her medical records were improperly accessed and shared by Wildman-Mackey, or that she was constructively discharged.

Because Plaintiff has failed to raise claims of national origin discrimination, that her medical records were improperly accessed and shared, and constructive discharge, she may not raise such claims in her federal lawsuit unless she can establish that the conduct she complains of is reasonably related to the conduct complained of in the administrative charge.  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 83 (2nd Cir. 2001).  Conduct may be

considered reasonably related where: (1) the conduct complained of in the federal complaint can reasonably be expected to grow out of the administrative claims of discrimination and therefore fall within the administrative investigation; (2) the conduct is retaliatory; or (3) the conduct complained of in the federal complaint is identical to conduct that was alleged in the administrative complaint. Butts v City of New York Dept. of Hous. Pres. & Dev., 990 F.2d 1397, 1401-1403 (2nd Cir. 1993).

In this case, Plaintiff's claim of national origin is sufficiently related to her claims of race discrimination made in her administrative complaint so that it can be considered to arise from or be related to that claim. See Deravin v. Kerik, 335 F.3d 195, 2010 (2d Cir. 2003) ("[R]ace and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the facts of a case.") (internal citations omitted) (citing Sinai v. New England Tel. and Tel. Co., 3 F.3d 471, 475 (1st Cir. 1993) ("Race and national origin discrimination may present identical factual issues when a victim is born in a nation whose primary stock is of one's own ethnic group," and "in certain circumstances, national origin and race discrimination may overlap.")).

Plaintiff's claim of improper access and sharing of her medical records, however, is not sufficiently related to her claims of race and age discrimination made in her administrative

complaint.  Further, no claim of improper access and sharing of her medical records arose during the administrative investigation of Plaintiff's claims, and Plaintiff did not at any time amend her administrative complaint to include allegations that her medical records were improperly accessed and shared.  Plaintiff's failure to allege improper access and sharing of her medical records in her administrative complaint precludes her from raising it in this proceeding.

With respect to Plaintiff's constructive discharge claim, Defendant asserts that said claim can be considered reasonably related to the claims raised in her EEOC complaint because "[a]t no time during the administrative investigation of her discrimination claims did Plaintiff state that the conditions of her employment were so egregious as to force her from her employment."  Dkt. No. 15 at 4.  Plaintiff counters, arguing that although she did not raise a constructive discharge claim, she did claim that her working conditions were unsatisfactory, alleging that she was being harassed by her co-workers and supervisor, singled-out for discipline, and being deliberately overworked.  Dkt. No. 18 at 7. To the extent that Plaintiff alleged a hostile work environment in her EEOC complaint, the  Court finds that her constructive

discharge claim is reasonably related to the charges in the EEOC Complaint and is therefore exhausted.[2]


## III. Plaintiff has Failed to State a Claim of Discrimination Based on Race, National Origin or Age

Plaintiff alleges that she was discriminated against on the basis of her race, national origin, and/or age.   Claims of employment discrimination are analyzed under the well-recognized burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and later refined in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).   The plaintiff bears the burden proving a prima facie case of discrimination. If the plaintiff succeeds in stating a prima facie case, the burden of production shifts to the defendant to state a legitimate, non-discriminatory reason for the employment action. Should the employer meet that burden, the burden of production then shifts back to the plaintiff to show that the reasons proffered by the employer were not the true reasons for the adverse employment action, but were a pretext for discrimination, and that discrimination was the real reason.   See Texas Dep't of Community

---

[2]

Additionally, as Plaintiff points out (Dkt. No. 18-5 at ¶ 92), Plaintiff filed her EEOC complaint in August 2007, and submitted her application for retirement in October 2007.   As such, Plaintiff could not have raised a constructive discharge claim in her EEOC Complaint.

Affairs v. Burdine, 450 U.S. 248, 252-53 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

To establish a prima facie case of race, national origin, and age discrimination under Title VII and the ADEA, a plaintiff must show: "membership in the protected age group, qualifications for the job[] at issue, an adverse employment action, and that the adverse action occurred under circumstances giving rise to an inference of discrimination." D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007) (citing Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003)). The plaintiff's burden in establishing a prima facie case is "minimal." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506), cert. denied, 530 U.S. 1261 (2000).

Here, for purposes of this motion, the parties do not dispute that Plaintiff is a member of a protected class as she is an African American (race) born in Trinidad (national origin) age 40 or over, and that she was qualified for her job as a registered nurse. Dkt. No. 15 at 9; Dkt. No. 18 at 6. However, for purposes of this motion, the Defendant disputes whether Plaintiff has demonstrated that she suffered an adverse employment action. Dkt. No. 15 at 9; Dkt. No. 21 at 6-9. Plaintiff claims that she satisfies prong three of the prima facie inquiry by demonstrating she suffered adverse employment actions in the form of verbal

discipline/reprimands, threats of Fitness-for-Duty examinations, and diminution in her nursing duties.  Dkt. No. 18 at 6-7. Defendant counters that the acts alleged by Plaintiff do not, as a matter of law, constitute adverse employment actions.  Dkt. No. 21 at 6-8.  The Court agrees with Defendant and finds that none of the complained-of actions constitute an adverse employment action for purposes of establishing a prima facie of race, national origin or age discrimination.

Plaintiff contends that she suffered the following adverse employment actions: (1) verbal discipline/reprimands; (2) threats of Fitness-For-Duty Examinations; and (3) the diminution of her duties.  Dkt. No. 18 at 6-7, 15.  As the Second Circuit has held,

> [a]n adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

Terry v. Ashcroft, 336 F.3d at 138 (internal citations and quotations omitted).

**Verbal Discipline/Reprimands**:

Plaintiff alleges that she suffered an adverse employment action when she was "made to attend multiple verbal disciplinary meetings with Imburgia" as a result of her charting errors.  Dkt.

No. 18 at 6.   Although Plaintiff characterizes these meetings as "disciplinary" in nature, there is no evidence in the record that suggests that any discipline was issued as a result of them, or that her position was in any way impacted by these meetings.   In fact, Plaintiff testified that she did not receive a letter of warning, she was not demoted, she never received a reduction in pay, and she was never yelled at, insulted or spoken to in a derogatory way.   Smith Dep. at 160.   A criticism of an employee without additional negative ramifications is not an adverse employment action.   See Weeks v. New York State Division of Parole, 273 F.3d 76 (2d Cir. 2001).

**Fitness-for-Duty Examination**

Plaintiff contends that she suffered an adverse employment action because she was "forced" to undergo a Fitness-for-Duty Examination resulting from the medical treatment she received for her eyes and for performance issues.   Dkt. No. 18 at 7, 15.   Being asked to undergo a Fitness-for-Duty examination does not constitute a "materially adverse" change in Plaintiff's employment status, and therefore does not amount to an adverse employment action.   See Farina v. Branford Bd. of Educ., 3:09-CV-49, 2010 U.S. Dist. LEXIS 99730, 2010 WL 3829160 at *19 (D. Conn. Sept. 23, 2010) aff'd, 458 F. App'x 13 (2d Cir. 2011) ("[Plaintiff] has cited no cases, and the court can find none, indicating that being forced to submit to a fitness for duty evaluation might constitute an adverse

employment action."). Moreover, Plaintiff admits that, despite Imburgia's request to undergo the examination, she never complied with her request.

## Diminution of Duties

Plaintiff asserts that she suffered an adverse employment action because she experienced a diminution in her duties. In support of this contention, she claims that: she was asked by Dr. Tunaitis to clean up the lunch room rather than assist Dr. Tunaitis with a physical examination, and that she was often required to clean up work left by her co-workers from the previous tour of duty. Dkt. No. 18 at 6-7, 15.

Conduct that may constitute adverse employment action includes "termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citing Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003)). However, any change in employment, must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to constitute an adverse employment action. Id. (citing Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006)); see also Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (to constitute an "adverse employment action," plaintiff must present evidence that

the employment action deprived plaintiff of some "tangible job benefits such as compensation, terms, conditions, or privileges of employment") (internal quotations omitted).

A plaintiff also may satisfy its burden by showing that the new work assignment was "materially less prestigious, materially less suited to his [or her] skills and expertise, or materially less conducive to career advancement." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000).  "Changes in assignments or duties that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." Weisbecker v. Sayville Union Free Sch. Dist., 890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012) (citing Galabya, 202 F.3d at 641);  see also Johnson v. Cnty. of Nassau, 480 F. Supp. 2d 581, 595 (E.D.N.Y. 2007) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" all are insufficient to constitute a tangible or material adverse employment action").

I find that Plaintiff has not satisfied her burden of demonstrating that the one occasion in which she was asked to clean the lunch room "radical[ly] changed" the nature of her work or deprived her of the terms of her employment.  Similarly, Plaintiff admits that the work left behind by the Tour II nurses was work that fell within her normal duties and responsibilities and was completed on her own accord.  Ragin v. East Ramapo Cent. School

Dist., No. 05 Civ. 6496, 2010 WL 1326779, at *30 (S.D.N.Y. March 31, 2010), aff'd 417 F.App'x 81 (2d Cir. 2011) ("In being assigned a task well within her job responsibilities, [the plaintiff] did not suffer an adverse employment action.").

I find that Plaintiff has not submitted any evidence tending to show that the complained-of acts constituted a "change in assignments or duties" that "radically changed" the nature of her work. See Weisbecker, 890 F. Supp. 2d at 233 (citing Galabya, 202 F.3d at 641).

Accordingly, I grant Defendant's motion for summary judgment with respect to Plaintiff's race, national origin, and age discrimination claims under Title VII and ADEA.

## IV. Retaliation

Plaintiff alleges that she was retaliated against because of her "complaints of discrimination" and that she was threatened by Imburgia in submitting to a Fitness-for-Duty examination. Complaint, ¶ 37.

To state a claim for retaliation, a plaintiff must establish: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff or action that would dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) a causal connection between the protected activity and adverse action. Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006); Holt v.

KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996), cert. denied, 520
U.S. 1228 (1997);   Tomka v. Seiler Corp., 66 F.3d 1295, 1308
(2d Cir. 1995) (citations omitted).

Defendant argues that Plaintiff has failed to establish that
she engaged in any protected activity.  I agree.  Plaintiff admits
that although she complained to Imburgia in 2007 that her co-
workers were receiving preferential treatment, she did not
specifically inform Imburgia that she felt she was being
discriminated against based on her age, race, or national origin.
Dkt. No. 18-5, ¶ 30; see also Smith Dep., at 156-157.  Because
Plaintiff did not complain of discrimination to Imburgia, making
those complaints in 2007 did not constitute "protected activity"
under Title VII or the ADEA.   See International Healthcare
Exchange, Inc. v. Global Healthcare Exchange, LLC, 470 F.Supp.2d
345, 347 (S.D.N.Y. 2007) (employee who failed to raise allegations
of discrimination in complaints to employer did not engage in
protected activity as employer was not made aware of any
discriminatory conduct).

Accordingly, I grant defendant's motion with respect to
Plaintiff's claim for retaliation.

**V.   Hostile Work Environment & Constructive Discharge Claims**

Plaintiff claims that she was subjected to a hostile work
environment based on her race, national origin, and age.  Dkt.
No. 18 at 10-14.  Plaintiff asserts further that she suffered

constant harassment and unfair treatment, which "ultimately [led] up to her decision to retire." Dkt. No. 18-5, ¶ 17. She claims that she "[did] not have any intention of retiring at the end of 2007 [and] [that] she intended to keep working." Id.

A hostile work environment under Title VII and the ADEA is established when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of a victim's employment and create an abusive working environment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond [the statutes'] purview." Id. In assessing the existence of a hostile work environment, the Court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

In support of her claim for a hostile work environment, she alleges that: Galeazzo and Wildman-Mackey routinely left work for Plaintiff at the end of their shift; Galeazzo and Wildman-Mackey "dumped" work on her; that Galeazzo and Wildman-Mackey actively sought out and reported Plaintiff's errors to Imburgia; she was

left out of meetings with other staff;  her co-workers and supervisor refused to answer questions about changes in procedures or charting practices;  she was subjected to discipline while co-workers faced no discipline for the same offenses;  her co-workers and supervisor repeatedly called into question her ability to do her job;  she was asked to submit to a Fitness-for-Duty Examination;  on one occasion, Galeazzo referred to another Postal Employee as an "ugly black pimp"; and finally, on one occasion, Galleazo stated that she "could not stand" a particular Postal Service employee who happened to be black.  Dkt. No. 18 at 11-12.

Even assuming the truth of these allegations, the alleged incidents are insufficient to create an issue of fact as to whether Plaintiff was subjected to a hostile working environment. Initially, the alleged incidents -- with the exception of the last two -- do not implicate any racial, national origin and/or age animus on their face.  Moreover, any implication of discrimination is belied by the fact that Plaintiff admits that:  her co-workers may have left work behind simply because they were lazy;  that the work left behind by the Tour II nurses was work that fell within her nursing duties;  that she made errors;  and that she too reported her co-workers' errors to Imburgia.  Smith Dep. at 93, 117-119, 131-133.  Next, while the racially-charged comment made by Galeazzo in 2006 in which she allegedly referred to another Postal Employee as an "ugly black pimp" was undoubtedly inappropriate and

offensive, it was a single, isolated remark that was in no way directed at Plaintiff. Similarly, the statement allegedly made by Galleazo that she "could not stand" a particular Postal Service employee who happened to be black, was not racial on its face, was an isolated incident, and was not directed at Plaintiff. While both of the comments made by Galeazzo were clearly unprofessional and rude, collectively they do not rise to the level of "severe and pervasive conduct" which might constitute a hostile work environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII"); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d. Cir. 1998) ("isolated remarks" or "occasional episodes of harassment" will not establish a claim under Title VII, "the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d. Cir. 1997) (for comments and slurs to constitute a hostile work environment, there must be "a steady barrage of opprobrious racial comments").

Moreover, "[a] constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (quoting Pena v.

Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983)) (internal quotation omitted).  To determine whether an individual has been constructively discharged, a court must consider (1) "whether plaintiff's employers deliberately created unbearable working conditions for the purpose of forcing plaintiff to resign; and (2) whether reasonable person in plaintiff's position would have felt compelled to resign." Stembridge v. City of New York, 88 F. Supp. 2d at 284 (citing Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993)).

Indeed, the undisputed evidence shows that Plaintiff was counseled by her supervisor on various occasions regarding her performance errors.  As a result, she was asked to undergo a Fitness-for-Duty examination, which also considered her absences and medical treatment to her eyes.  However, the evidence proffered by the Plaintiff is insufficient for a reasonable jury to conclude that her working conditions were so intolerable (see discussion above) that a reasonable person would have felt compelled to resign.  Accordingly, I find that Plaintiff has not presented sufficient evidence for a reasonable jury to conclude that she was constructively discharged, considering the fact that she retired at age 77 and after having undergone eye surgeries during 2007.

In sum, I grant Defendant's motion for summary judgment with respect to Plaintiff's hostile work environment and constructive discharge claims.

-24-

**CONCLUSION**

For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted.  Plaintiff's Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:       February 21, 2014
             Rochester, New York